**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NANCY NETHERLAND and** | ) |
| **CLEVELAND NETHERLAND** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 04-00654 (RMC)** |
| | ) |
| **ELI LILLY AND COMPANY, *et al.*** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**<u>MEMORANDUM OPINION</u>**

Because her mother took diethylstilbestrol ("DES") to avoid a miscarriage when Nancy Netherland was *in utero*, Ms. Netherland suffers from a malformed uterus and infertility. She and her husband, Cleveland Netherland,[1] have sued the pharmaceutical companies that manufactured DES for damages arising from these unfortunate facts. Eli Lilly and Company ("Lilly") and Premo Pharmaceutical Laboratories, Inc. ("Premo") have filed motions for summary judgment, which Nancy and Cleveland Netherland oppose.[2] The Court concludes that Louisiana law must be applied to Ms. Netherland's claims and that the Netherlands have not proffered sufficient evidence on which a reasonably jury could find that the DES ingested by Nancy Netherland's mother was manufactured by Lilly. In addition, there is no evidence, and the Netherlands make no argument, that the DES ingested by Nancy Netherland's mother was manufactured by Premo. For these reasons, all of Ms.

---

[1] Mr. Netherland took his wife's last name upon their marriage.

[2] Lilly filed its Motion for Summary Judgment on August 25, 2005 [Dkt. No. 35] and Premo filed its Motion for Summary Judgment on the same date, incorporating by reference the arguments and materials submitted by Lilly in its motion. *See* Defendant Premo Pharmaceutical Laboratories Inc.'s Motion for Summary Judgment at 1 [Dkt. No. 36].

Netherland's claims against Lilly and Premo will be dismissed.  However, California applies to Mr.

Netherland's claim of loss of consortium.  With respect to this claim, both Defendants' motions for

summary judgment will be denied.

## I.  BACKGROUND

Nan Cleveland Netherland ("Mrs. Netherland"), Nancy Netherland's mother, became

pregnant with Ms. Netherland in approximately July 1963 while living in New Orleans, Louisiana.[3]

At six to eight weeks into her pregnancy, Mrs. Netherland was prescribed DES to prevent

miscarriage, as she had suffered one earlier.[4]  At that time, Mrs. Netherland and her husband (Nancy

Netherland's father), Warren Netherland, lived at 3897½ Perrier Street in New Orleans, Louisiana,

and used the Katz & Besthoff Drugstore ("K&B") at the corner of St. Charles and Napoleon Streets.[5]

Mrs. Netherland does not remember specifically whether she filled her first prescription for DES at

this K&B pharmacy, but she does remember being prescribed DES and ingesting a pill on a daily

basis during the remainder of her pregnancy.

At her doctor's advice, Mr. and Mrs. Netherland moved from Perrier Street, where

---

[3]  Except where noted, the facts are not disputed.

[4]  DES "is a synthetic nonsteroidal estrogen that was used to prevent miscarriage and other pregnancy complications between 1938 and 1971 in the United States. . . . Women who were exposed to [DES] in utero may have structural reproductive tract anomalies, an increased fertility rate, and poor pregnancy outcomes." BETH E. POTTER & MONICA SCHRAGER, AMERICAN ACADEMY OF FAMILY PHYSICIANS, DIETHYLSTILBESTROL EXPOSURE 1 (2004), http://www.aafp.org/afp/20040515/2395.pdf.  "DES Daughters are defined as women born between 1938 and 1971 who were exposed to DES before birth (in the womb).  Research has confirmed that DES Daughters are at an increased risk for . . . [r]eproductive tract structural differences (for example, T-shaped uterus)."  Center for Disease Control, DES Daughters, http://www.cdc.gov/DES/consumers/daughters/index.html (last visited Feb. 7, 2006).

[5]  K&B was a well-established local drug store with multiple locations in New Orleans. Long after the relevant events here, the K&B chain was acquired by Rite Aid.

she had to climb stairs, to a ground-floor residence at 6010 Vermillion Boulevard in New Orleans. After the move, they used a K&B located at 3100 Gentilly Boulevard.[6] Pharmacist William Barclay worked at the K&B pharmacy at 3100 Gentilly Boulevard from 1961-1965.[7] Mr. Barclay first worked at the 3100 Gentilly Boulevard location on a part-time basis while he was in pharmacy school. Barclay Dep. at 29, 30. After graduation in 1963, he became an assistant pharmacist there. *Id.* at 33. That K&B drug store was "the largest K&B at the time . . . the busiest K&B at the time." *Id.* at 30. Mr. Barclay was a first-year assistant pharmacist at the K&B at 3100 Gentilly Boulevard during the time period of Mrs. Netherland's pregnancy and prescription for DES. He worked at K&B, and then Rite Aid after it acquired K&B, for his entire career, retiring in 1997. *Id.* at 30-35.

There are no pharmacy records from K&B drug stores that are available. Mr. Barclay testified that the K&B located at 3100 Gentilly Boulevard stocked DES manufactured by Lilly. *Id.* at 49-51. He also recalled that the same K&B stocked drugs manufactured by Squibb and Upjohn. *Id.* at 84. In 1963 and 1964, DES was manufactured by approximately 100 companies, including Squibb and Upjohn. *See* Henninger Aff., Exs., 8A-8C (1963-64 *American Druggist Blue Book* ("Blue Book") (listing 38 manufacturers); 1964 and 1965 *Drug Topics Red Book* ("Red Book") (listing 100 manufacturers in 1963 and 104 manufacturers in 1964)).[8] Not surprisingly, Mr. Barclay

---

[6] The deposition testimony of Mr. and Mrs. Netherland variously identified the location of the drug store as at the intersection of Esplanade and Gentilly Woods or Esplanade and Broad streets. They each corrected their deposition transcripts to state that the K&B drug store in question was at the intersection of Gentilly Woods and Elysian, *i.e.*, 3100 Gentilly Boulevard

[7] Mr. Barclay's deposition testimony is available to these parties from an earlier DES case.

[8] The Netherlands object to introduction of these exhibits, which are authenticated by a lawyer's affidavit.

has no recollection of the prescriptions that he filled back in 1963-64, his very first year as a pharmacist. Barclay Dep. at 37. He testified that he does, however, "vividly remember the Lilly products," including an accurate description of the label on DES. *Id.* at 39. The practice at K&B drug stores was to fill the prescription as written by the doctor, so that if a doctor specified a particular drug manufacturer, the pharmacist would get that manufacturer's product to fill the prescription. *Id.* at 40. They would first try to get the requested drug at the K&B warehouse or, if it were not at the warehouse, get it directly from the wholesale distributor. *Id.* at 40-43; *see also id.* at 43 ("Q. But was it your practice in the '60s when you were working at a K&B pharmacy that you would honor a doctor's prescription for a particular manufacturer's drug? A. Yes. Q. You would not fill it with someone else's drug that maybe did the same thing? A. Correct."). While Mr. Barclay clearly remembers stocking and selling Lilly products, K&B sold other manufacturers' drugs as well.

> Q. Can you be positive that you didn't have other products [besides Lilly's DES] in stock? If there were over a hundred manufacturers of DES, how do you know that you didn't have other DES on the shelves at any given time in the '60s, '70s?
> . . .
> A. I can only say that we stocked mostly Lilly products. I cannot say that I – I remember exactly that we did not have the other brands on the shelf.
> Q. You mean other brands of DES?
> A. Right.
> Q. You do remember stocking Lilly products generally?
> A. Yes.
> Q. But you also recall that K&B stocked many manufacturers' products?
> A. Of course.
> . . .
> Q. You can't be sure here today that only Lilly's DES was on the shelves at K&B while you were work[ing] there?
> A. I cannot say that there was not one other brand other than Lilly with certainty. But I can say that I don't know of ever dispensing anything other than the Lilly product.

*Id.* at 48-51.

Neither Mrs. nor Mr. Netherland can recall any details about the DES pills she took during her pregnancy in 1963-64, including who manufactured them, their dosage, or their packaging. Her prescribing physician is deceased and no one has information about his records or prescribing practices.  Ms. Netherland was born on March 14, 1964, at the Ochsner Clinic in New Orleans.

The Netherland family moved from Louisiana to the State of Washington in 1965. Ms. Netherland has never again lived in Louisiana.  She first learned as a young teenager in Washington that she had been exposed *in utero* to DES.  Ms. Netherland moved to California to attend college in 1982 and has been a resident of that State ever since.  Ms. Netherland met and married her husband, Cleveland, in California.[9]  Cleveland Netherland is a native Californian and has never lived outside that State.

Ms. Netherland underwent fertility treatment at Kaiser Permanente in San Francisco, California, beginning in 2002.  She underwent a hysterosalpingogram ("HSG") in California, performed by Seth Feigenbaum, M.D., a California reproductive endocrinologist.  It was in 2002 that Dr. Feigenbaum first diagnosed Ms. Netherland with a severely abnormal uterine cavity, *i.e.*, a T-shaped uterus, consistent with DES exposure.  He advised that Ms. Netherland that she would never be able to carry a pregnancy and recommended surrogacy or adoption.  Thus, both Nancy and Cleveland Netherland learned in California that Ms. Netherland had a DES-related injury and that they would not be able to have children of their own without expensive assisted reproduction and/or

_____

[9]  The family names might be confusing.  Mrs. Netherland's first name is Nan; her maiden name is Cleveland; she goes by Nan Cleveland Netherland.  Mrs. Netherland's husband is named Warren; she is also, therefore, Mrs. Warren Netherland.  Her daughter, the plaintiff, is named Nancy.  Nancy Netherland married Cleveland, who took Nancy's last name.  They are Mr. and Mrs. Cleveland Netherland.  Nan Netherland is referred to throughout as "Mrs. Netherland" and Nancy Netherland is referred to throughout as "Ms. Netherland."

adoption.

Lilly made and sold DES for use in the prevention of miscarriage in 1963-64.  Lilly is headquartered in the State of Indiana and that State was the location of its plant that manufactured DES.  DES was taken off the market in 1971.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Plaintiffs are residents of the State of California.  Neither defendant is incorporated in California or has its principal place of business in California.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the parties are from different states and the amount in controversy exceeds $75,000.  *See Saadeh v. Farouki,* 107 F.3d 52, 54-55 (D.C. Cir. 1997).

### B.  Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This remedy is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  To be deemed "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case.  *Anderson*, 477 U.S. at

247-48; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  It is a district court's duty to weigh the evidence and decide whether it is so one sided "that one party must prevail as a matter of law," or if there is a sufficient disagreement presented in the evidence such that reasonable minds may differ, therefore requiring the submission of the case to a jury. *Anderson*, 477 U.S. at 251-52.

## III.  ANALYSIS

Defendants' motions for summary judgment present two fundamental questions: (1) which State's law applicable to the Netherlands' claims and (2) what quantum of proof exists that Mrs. Netherland took DES pills manufactured by either Defendant?

### A.      Which State's Law Is Applicable?

Federal district courts sitting in diversity must apply the conflicts laws of the forum in which they sit.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  In ruling on which jurisdiction's law to apply, local courts in the District of Columbia "use the 'governmental interests' analysis, under which [they] evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review."  *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).  "Part of the test of determining the jurisdiction whose policy would be most advanced is determining which jurisdiction has the most significant relationship to the dispute."  *Id.*  A false conflict exists when the policy of only one jurisdiction would be advanced by having its policy applied, while the policy of the other jurisdiction would not be advanced even if it were applied.  *Id.*; *see Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1229 (D.C. Cir. 2004) (holding that because Virginia had a clear policy on

medical malpractice and the District of Columbia had none, Virginia law should have been

applied).  As a part of the analysis, D.C. courts also consider the four factors identified in the

Restatement (Second) of Conflict of Laws § 145:

> a) the place where the injury occurred;
> b) the place where the conduct causing the injury occurred;
> c) the domicile, residence, nationality, place of incorporation and place
> of business of the parties; and
> d) the place where the relationship is centered.

*Coleman*, 667 A.2d at 816.

Although this lawsuit was filed in the District of Columbia, the parties disagree on

whether this Court should apply the law of Louisiana or California; neither argues that D.C. law

is applicable.

Lilly argues that the Court should apply Louisiana law,[10] which requires plaintiffs

---

[10]In pertinent part, the LPLA reads:

A.  The manufacturer of a product shall be liable to a claimant for
damage proximately caused by a characteristic of the product that
renders the product unreasonably dangerous when such damage
arose from a reasonably anticipated use of the product by the
claimant or another person or entity.

B.  A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or
composition as provided in R.S. § 9:2800.55;
(2) The product is unreasonably dangerous in design as provided
in R.S. § 9:2800.56; . . .

C.  The characteristic of the product that renders it unreasonably
dangerous under R.S. 9:2800.55 must exist at the time the
product left the control of the manufacturer.  The characteristic of
the product that renders it unreasonably dangerous under R.S.
§ 9:2800.56 or § 9:2800.57 must exist at the time the product left
the control of the manufacturer or result from a reasonably
anticipated alteration or modification of the product.

D.  The claimant has the burden of proving the elements of Subsections
A, B and C of this Section.

in product liability cases to establish that their injuries were caused by the defendant's product. *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 246 (E.D. La. 1996), *aff'd*, 106 F.3d 1245 (5th Cir. 1997).  Under the Louisiana Products Liability Act ("LPLA"), La. Rev. Stat. Ann. § 9:2800.51 - 19 (West 1988), a plaintiff must prove proximate causation between a manufacturer's product and his or her injury.  *See Jefferson*, 930 F. Supp. at 246 ("Plaintiff's obligation to identify the manufacturer of the allegedly defective product is inherent in the LPLA's requirement that plaintiff prove proximate causation.").  The LPLA "establishes the exclusive theories of liability for manufacturers for damages caused by their products."  La. Rev. Stat. Ann. § 9:2800.52.  As a result, the theory of market share liability, developed by California courts, is not recognized in Louisiana.  *Jefferson*, 930 F. Supp. at 246.

        The Netherlands argue that there is no "true" conflict because Louisiana has no reasonable expectation that its law would be applied to the case of a person who has not lived in Louisiana in decades.  They note that both plaintiffs are long-time California residents who met and married there, and that the DES-related injuries they claim were manifested, diagnosed, and treated in California by California doctors.  *See* Plaintiffs' Response and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp.") at 4.  They urge the Court to find that only California law should apply.  California law is distinctly different from Louisiana law.  In the same year that Louisiana passed the LPLA, the California Supreme Court developed the market share theory of liability to apply in particular to DES cases.  *See Sindell v. Abbott Lab.*, 607 P.2d 924 (Cal. 1980).  Under a "market share" theory, a manufacturer may be

_____

        La. Rev. Stat. § 9:2800.54.

held liable based upon its share of the market, even when a plaintiff cannot prove the particular

brand of DES ingested by her mother.  In advancing this theory of liability, the California

Supreme Court relied heavily on policy:

> In our contemporary complex industrialized society, advances in science
> and technology create fungible goods which may harm consumers and
> which cannot be traced to any specific producer.  The response of the
> courts can be either to adhere rigidly to prior doctrine, denying recovery
> to those injured by such products, or to fashion remedies to meet these
> changing needs.

*Id.* at 936.  It is undisputed that women who reside in California may take advantage of this

broader approach to liability, without regard to where their mothers actually took the offending

drug.  In fact, Lilly itself has argued that the market-share theory should apply to a case brought

by a California resident and not the law of Pennsylvania, where that plaintiff was born.  *See* Pls.'

Opp. at 14, Ex. P, Excerpts of Memorandum of Points and Authorities in Support of Defendant

Eli Lilly's Motion for Summary Judgment, *Hansch v. Eli Lilly & Co.*, Civil Action No. 04-122-

CW  (N.D. Cal).

   *1.  Is there a true conflict?*

   The first question is whether the Court should consider the interest of the State of

Louisiana at all.  For this purpose, the Court relies on the four factors identified in the

Restatement (Second) Conflict of Laws ("§ 145").  Ms. Netherland argues that the place of injury

is California because it is where her abnormal uterus was first diagnosed, where the connection

of the abnormality to DES ingestion by her mother during pregnancy was first made clear, the

location of her marriage and long-term residence, and the location of her medical care providers.

*See* Pls.' Opp. at 4.  Lilly argues that Louisiana was the place of injury because that was where

Mrs. Netherland's obstetrician allegedly prescribed DES, that was where Mrs. Netherland

purchased the drug at K&B pharmacies, that was where DES was ingested by Mrs. Netherland,

that was where Ms. Netherland was exposed to DES *in utero*, and that was where Ms. Netherland

was born, ending her exposure.  *See* Defendant Eli Lilly's Memorandum of Points and

Authorities in Support of Its Motion for Summary Judgment ("Defs.' Mem.") at 6-7.

   The Netherlands have been told that Ms. Netherland cannot bear children because

the exposure to DES before her birth has resulted in a structural abnormality in the shape of her

uterus, causing it to be T-shaped, a classic outcome of DES exposure *in utero*.  *See* BETH E.

POTTER & MONICA SCHRAGER, AMERICAN ACADEMY OF FAMILY PHYSICIANS,

DIETHYLSTILBESTROL EXPOSURE 2 (2004), http://www.aafp.org/afp/20040515/2395.pdf.  It

appears unlikely that such a structural abnormality would have developed only later in Ms.

Netherland's life and not have existed from her birth.[11]  The consequences of her exposure to

DES are being borne out in California, where the Netherlands are grappling with difficult facts

and expenses and where the cause of action ripened.  These consequences give California an

interest in having its tort law applied.  But under § 145, the Court also looks to the place of

injury, and the place of Ms. Netherland's exposure to DES and her resulting injury was

---

[11]  *See* Centers for Disease Control, www.cdc.gov/DES/consumers/research/recent_
infertility.html (last visited Feb. 7, 2006) ("Most DES Daughters who never became pregnant had
been exposed to DES during the first 9 weeks in the womb.  This finding supports earlier
research, which found that structural abnormalities that affect fertility (such as endometriosis,
abnormalities of the fallopian tubes, and inadequate production of cervical mucus) were more
common among women whose DES exposure occurred during their first trimester of
pregnancy.").

Louisiana.  This fact gives the State of Louisiana an interest in having its law applied.[12]

Louisiana is also the place where the conduct causing the injury occurred.  Lilly placed the DES

allegedly ingested by Mrs. Netherland into the stream of commerce in the State of Louisiana,

where it arrived with allegedly insufficient warnings to counsel Mrs. Netherland's doctor against

prescribing it.

California is the residence and domicile of the Netherlands.  Indiana is the place

of business and was the place of manufacture for Lilly.  Louisiana was the residence of Mrs.

Netherland at the time of her pregnancy and ingestion of DES.  It was also the first residence of

Ms. Netherland at her birth.   Thus, all three States have some interest under this factor in having

the law of their jurisdiction applied, with Indiana in a distant third place.[13]

The factor that considers "the place where the relationship is centered" prompts

very different responses from the parties.  Ms. Netherland states that her only relationship with

Lilly is through this lawsuit and that the relationship is centered in California, where she was

diagnosed and her cause of action matured.  Ms. Netherland distances herself from her mother,

who she essentially concedes had a "relationship" with Lilly in Louisiana, as if she was not also

present *in utero* (the location of her exposure to DES) and at birth.  Lilly argues that if it has ever

---

[12]  Because the injury occurred in Louisiana, the fact that Ms. Netherland grew up in
Washington State, where she first learned that her mother had taken DES during her pregnancy,
does not establish Washington as the place of injury or a State with an interest in having its law
applied.

[13] Although the drug was manufactured and packaged in Indiana, which is also the locus
of Lilly's headquarters, neither party argues that Indiana law should apply.  Since these factors
are the only connections between the parties and Indiana, and other factors counsel in favor of
Louisiana or California law, the Court will not further consider the application of Indiana law.

had a relationship with either Ms. Netherland or her mother,[14] it only occurred in Louisiana,

where Mrs. Netherland's doctor prescribed DES, Mrs. Netherland filled that prescription and

obtained DES, Mrs. Netherland ingested DES while pregnant with Ms. Netherland, and Ms.

Netherland was born, ending her exposure to DES.  The Court agrees with Lilly that its

relationship with Mrs. and Ms. Netherland, if it had one, was centered in Louisiana for the

reasons given by Lilly.  As a result, Louisiana has an interest in having its law applied.

The Court does not accept the Netherlands' argument that Louisiana "has *no*

interest or contacts with [Ms. Netherland] or [her] cause of action."  Pls.' Opp. at 4 (emphasis

added).  Because Louisiana has at least some interest, a true conflict of laws exists.

2.   *Which Jurisdiction's Policy Would Be More Advanced by Being Applied?*

Through the action of its State legislature, Louisiana adopted the LPLA in 1988 to

"establish[] the exclusive theories of liability for manufacturers for damages caused by their

products" and to require that a plaintiff prove proximate causation between her injury and the

defendant's product.  La. Rev. Stat. Ann. § 9:2800.52.  The history of the legislation

demonstrates Louisiana's intentional adoption of certain limitations for product liability cases:

> In 1986, the Louisiana Supreme Court concluded that a manufacturer
> could be held strictly liable for injuries caused by a product found to be
> "unreasonably dangerous per se."  *Halphen v. Johns-Manville Sales
> Corp.*, 484 So. 2d 110, 113 (La. 1986).  Soon after the *Halphen* decision,
> the Louisiana legislature passed the Louisiana Product Liability Act,
> which became effective on September 1, 1988. . . . The unreasonably
> dangerous per se liability theory is not among those recognized by the
> LPLA. . . . One of the legislature's primary purposes in enacting the
> LPLA was to overrule *Halphen*.

---

[14]   Since Lilly argues that there is insufficient evidence that Mrs. Netherland ingested
DES manufactured by Lilly, it does not concede that it has ever had any relationship with Mrs. or
Ms. Netherland at any time.

*Brown v. R.J. Reynolds Tobacco Corp.*, 52 F.3d 524, 526 (5th Cir. 1995).  *Halphen* was an action brought by a worker (deceased) and his wife concerning his exposure to asbestos and resulting lung cancer.  The case was brought in federal court, and on appeal of a jury verdict in the plaintiffs' favor, the Fifth Circuit asked the Louisiana Supreme Court whether it recognized the plaintiffs' theory of liability – that a product could be unreasonably dangerous per se without regard to the manufacturer's knowledge of the danger.  *Halphen v. Johns-Manville Sales Corp.*, 752 F.2d 124 (5th Cir. 1985) (*en banc*).  When the Louisiana Supreme Court responded affirmatively, the State Legislature overruled it by passing the LPLA.  Importantly, Louisiana's insistence that a plaintiff be able to prove proximate cause between a manufacturer's product and a plaintiff's injuries was adopted in the face of a case involving asbestosis, a long-standing latent disease which can make such proof difficult to obtain.[15]

The LPLA represents the voice of the Louisiana legislature and its declaration of that State's policy.  Very clearly, a plaintiff must prove that a manufacturer's product was the proximate cause of the plaintiff's injuries.  Theories of liability not recognized in the LPLA are not recognized in Louisiana.  Faced with a Louisiana Supreme Court decision that admitted strict liability, the legislature reversed.  California's market share theory of liability is a different form of strict liability, whereby all manufacturers of a "fungible" product are responsible for harm to an individual plaintiff even when the plaintiff cannot prove which product she ingested.  *See Sindell*, 607 P.2d at 595.  In the very year that California's Supreme Court enunciated its new

---

[15]  For this reason, as well as the statute's express requirement that a plaintiff prove proximate cause, the Court does not believe that the LPLA would admit a "market share" theory of liability.  It finds the Netherlands' arguments to the contrary to be without merit.

theory of liability, the State of Louisiana rejected that kind of approach as enunciated by its own

Supreme Court.  This history suggests that the State of Louisiana has a strong interest in having

its explicit public policy applied for product liability cases arising in that State.[16]  *See Jefferson v.*

*Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247-48 (5th Cir. 1997) (finding that the LPLA excludes

the market share liability theory and refusing to certify the question to the Louisiana Supreme

Court).

        California's policy is equally clear and is applied by that State's courts to all

litigants who reside in California.  The California Supreme Court weighed the interests of the

manufacturers and those of injured consumers and decided that the manufacturers should bear the

costs of harm caused by fungible goods which cannot be traced to an individual manufacturer:

> [T]he manufacturer is in the best position to discover and guard against
> defects in its products and to warn of harmful effects; thus, holding it
> liable for defects and failure to warn of harmful effects will provide an
> incentive to product safety.

*Sindell*, 607 P.2d at 936.  The Netherlands argue that California's theory of market share liability

should be applied here: Ms. Netherland has lived in California since she was 18; her condition

was diagnosed and is being treated in California; her cause of action arose upon diagnosis in

California; and she met Mr. Netherland and married him in California.  For Mr. Netherland's loss

of consortium claim, they point out that he has never lived outside the State of California and that

---

[16]  The LPLA applies to all causes of action that accrued on or after September 1, 1988.
*See Brown v. R.J. Reynolds Tobacco Corp.*, 52 F.3d at 526.  "With a latent disease, this is usually
upon diagnosis."  *Id.* at 528.  Because Ms. Netherland's diagnosis was made in 2002, the LPLA
would apply to her case if she sued in the State of Louisiana.  The law in Louisiana before the
LPLA also required a showing of proximate cause between a product and an injury.  *See Fricke
v. Owens-Corning Fiberglass Corp.*, 618 So. 2d 473, 475 (La. Ct. App. 1993) (involving a pre-
1988 accident).

all of the impact of Ms. Netherland's condition has fallen on him in the State of California.

Simply put, the Netherlands say that they live in California and are entitled to have the law of

their home state applied to this case.

       The Court concludes that the public policy interests of Louisiana and California

are in equipoise.  Both are clear and in direct conflict as to Ms. Netherland's claims.  It is not

possible to identify which States' policy "would be more advanced by the application of its law

to the facts of the case under review."  *See Coleman*, 667 A.2d at 816.  Since the "governments'

interests" test does not reveal the answer, the Court looks again to the four factors identified in

§ 145.  The place where the injury occurred was Louisiana.  The conduct that caused the injury

occurred in Louisiana.  The domicile of the plaintiffs is California and the place of business of

Lilly is Indiana.  The place where the relationship is centered between Ms. Netherland and Lilly

is Louisiana.  In light of these four factors, the Court concludes that the law of Louisiana should

be applied to Ms. Netherland's claims.

       This conclusion is buttressed by the discussion of the District of Columbia Circuit

Court of Appeals in *Tidler v. Eli Lilly & Co.*, 851 F.2d 418 (D.C. Cir. 1988).  In *Tidler*, the D.C.

Circuit affirmed the district court's decision that the law of the plaintiffs' residences applied in

the absence of findings "indicating the jurisdiction in which either their mothers were resident

when they took DES or where the plaintiffs' injuries occurred."  *Id.* at 420.  Unlike *Tidler*, in this

case we have clear evidence that Mrs. Netherland was a Louisiana resident when she took DES

and that Ms. Netherland was *in utero* in Louisiana during the entirety of her exposure to DES.

       However, the same conclusion does not apply to Mr. Netherland's loss of

consortium claim.  Each plaintiff is entitled to a separate choice of laws analysis and it is clear

that California law – which allows a loss of consortium claim to stand alone, regardless of the viability of the spouse's claim[17] – applies to his allegations.  Mr. Netherland is a lifelong resident of California, met and married Ms. Netherland in that State, and learned of the unfortunate consequences of her DES exposure in California, where his marriage has had to deal with those consequences.  All factors point to California as having the greater interest.  Indeed, because Mr. Netherland has no connection of any kind with Louisiana, there is no conflict to be evaluated.

> For these reasons, the Court concludes that Louisiana law applies to Ms. Netherland's claims and California law applies to Mr. Netherland's claim.

### B.  Does Ms. Netherland Have Sufficient Evidence to Have a Jury Decide Whether Mrs. Netherland Ingested DES Manufactured by Either Defendant?

> Ms. Netherland argues that "the testimony of William Barclay, R. Ph., and [her] parents clearly demonstrate that only the Lilly brand of DES was dispensed from the K&B Pharmacy at 3100 Gentilly Boulevard" and that she is entitled to have a jury consider this evidence.  Pls.' Opp. at 25.  Ms. Netherland insists that "Mr. Barclay testified that he dispensed *only* the Eli Lilly brand of DES and knew of no other company who made it, that he properly identified the Lilly bottle and label, and – most importantly – *that Lilly has no witnesses or records indicating that DES manufactured by any drug company <u>other than Lilly</u> was stocked at K&B Pharmacy in 1963-64.*"  Plaintiffs' Surreply In Response to Reply Briefs of Defendants

---

[17]  *See Lantis v. Condon*, 157 Cal. Rptr. 22, 22 (Cal. Ct. App. 1979) (noting that although a wife's claim for loss of consortium arose "from the bodily injury to her husband, the injury suffered is personal to the wife.  Loss of her husband's consortium impairs a wife's interests which are wholly separate and distinct from that of her husband . . .") (citations omitted).

("Pls.' Surreply") at 10-11.[18]  Ms. Netherland also notes that the Physicians' Desk Reference,

from which many doctors obtain prescribing information, listed only Lilly as a manufacturer of

DES in 1963-64, despite the fact that many other drug companies manufactured DES as well.

Lilly, joined by Premo, argues that Ms. Netherland exaggerates Mr. Barclay's

testimony.  It notes that he testified that K&B would fill a prescription as written by a doctor,

even if it meant getting a requested drug from a wholesaler because the local K&B branch did

not stock it and K&B did not stock it in its warehouse.  Mr. Barclay also testified that K&B

pharmacies stocked items differently and that he had no information concerning the drugs

stocked at K&B locations other than 3100 Gentilly Boulevard, where Mrs. Netherland may have

purchased her first DES prescription.  Since there is no evidence on the prescription practices of

Mrs. Netherland's doctor, no pharmacy records, and no recollection of Mr. or Mrs. Warren

Netherland concerning the type of DES she took or its description, Lilly argues that there is no

evidence that Mrs. Netherland took DES manufactured by Lilly (or Premo) and not by some

other DES manufacturer.

It is worth emphasizing that Mr. Barclay's deposition was taken in a different case

so these litigants did not question him.  Two aspects of his testimony are important.  First, as

quoted above, he acknowledged that the K&B at 3100 Gentilly Boulevard might have stocked

DES manufactured by other manufacturers than Lilly, even though it generally stocked Lilly

products.  Second, although Mr. Barclay himself never dispensed any DES other than the Lilly

_____

[18]  This last point confuses the party with the burden of proof.  As a plaintiff under the
LPLA, Ms. Netherland has the burden to demonstrate that the DES ingested by Mrs. Netherland
was manufactured by Lilly.  Lilly has no burden to prove that it was not.  The testimony of Mr.
Barclay was that other brands of DES may have been stocked at the K&B at 3100 Gentilly
Boulevard and that K&B stocked hundreds or thousands of drugs.  *See* Barclay Dep. at 38-41.

brand, he testified that the 3100 Gentilly Boulevard pharmacy was the largest K&B at the time and very busy.  He was never asked about the dispensing practices of other pharmacists in the store, nor about its hours and whether he worked during all the hours it was open.  Since Mr. Barclay was a first-year pharmacist during the time in question, it is no surprise that he cannot be more definitive in his testimony.

Ms. Netherland cites *Shields v. Eli Lilly & Co.*, 895 F.2d 1463 (D.C. Cir. 1990), for the proposition that she does not have to "negative every other positive or possible conclusion.  To be significantly probative, evidence need only be sufficient to permit a reasonable juror, indulging all reasonable inferences, to find that the party proved the element at issue." 895 F.2d at 1465.  Because the Court has determined that Louisiana law applies to her claims, it refers to that State's precedent to identify Ms. Netherland's burdens under the LPLA.

> The initial element a plaintiff must establish pursuant to the LPLA is that there is proximate causation, that is a link between the actions of the manufacturer and the injury causing product.  Any plaintiff asserting liability for damage caused by a product must prove under the LPLA that: (1) the defendant manufactured the product; (2) the product was unreasonably dangerous for reasonably anticipated use, and (3) the dangerous characteristic of the product existed at the time the product left the manufacturer's control.

*George v. Hous. Auth. of New Orleans*, 906 So. 2d 1282, 1286 (La. Ct. App. 2005).  In *Bernard v. Ferrellgas, Inc.*, 689 So. 2d 554 (La. Ct. App. 1997), the Louisiana Court of Appeals "held that the plaintiff has the burden of proving that the defendant manufactured the product, and this can only be construed as proving a connection between the offending product and its manufacturer." *George*, 906 So. 2d at 1287.  When faced with a motion for summary judgment, "the plaintiffs [must] produce factual support sufficient to establish that they will be able to

satisfy their evidentiary burden at trial." *Id.* at 1286.  Lilly relies heavily upon *George* to support

its argument that Ms. Netherland has insufficient evidence to avoid summary judgment.

      The Court also turns to *Bernard v. Ferrellgas* to understand how Louisiana courts

apply the strictures of the LPLA.  In *Bernard*, a widow sued under a theory of products liability

against the manufacturer of an outdoor meat smoker.  689 So. 2d at 556.  Although *Bernard* was

reviewing a trial court's grant of a directed verdict in favor of the defendant, the Louisiana Court

of Appeals, Third Circuit, stated that the standard that it would apply "mirrors the standard for

granting summary judgment."  *Id.* at 557.  "The court should consider all the evidence – not just

that evidence which supports the non-mover's cases – but in the light and with all reasonable

inferences most favorable to the party opposed to the motion." *Id.* (quoting *Boeing Co. v.

Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)).

      Under this standard, Ms. Netherland cannot withstand Lilly's motion for summary

judgment.  Indeed, if the record evidence were before the Court at trial, it would be compelled to

grant a directed verdict in Lilly's favor.  There is no evidence that the DES ingested by Mrs.

Netherland was manufactured by Lilly.  According to Mr. Barclay, K&B would have obtained

the prescribed drug even if it were not regularly stocked by the pharmacy.  There is no record of

the prescribing practices of Mrs. Netherland's physician.  Mr. Barclay testified that he personally

has no recollection of ever dispensing any DES other than that manufactured by Lilly and he

supported this testimony with an accurate description of the label used by Lilly at the time.

However, he was an assistant pharmacist in K&B's largest pharmacy.  He gave no testimony

about prescriptions filled by other pharmacists.  He gave no testimony about prescriptions for

Mrs. Netherland.  Thus, the record reveals two unconnected facts: Mrs. Netherland ingested DES

that she purchased from K&B at 3100 Gentilly Boulevard and Mr. Barclay dispensed DES manufactured by Lilly from the K&B at 3100 Gentilly Boulevard.  Were Mr. Barclay the only or primary pharmacist at 3100 Gentilly Boulevard, of course, one might infer a connection between these two facts.  But no reasonable jury could bridge the gap.[19]  Lilly's motion for summary judgment will be granted because Ms. Netherland cannot meet her burden to show proximate cause between Lilly's DES and her injuries.  In the absence of any evidence that Mrs. Netherland ingested DES manufactured by Premo, the Court will also grant Premo's motion for summary judgment on Ms. Netherland's claims.

However, both Lilly's and Premo's motions for summary judgment will be denied with respect to Mr. Netherland's claim for loss of consortium.  As noted above, California law applies to this claim and there may be market share liability between each defendant.  The Court expresses no opinion on this point because the contours of Mr. Netherland's claim as a stand-alone claim under California law has not been briefed by the parties.

## IV. CONCLUSION

For the foregoing reasons, Defendant Lilly's motion for summary judgment will be granted in part and denied in part and Defendant Premo's motion for summary judgment will be granted in part and denied in part.

---

[19] Neither party suggests that the totality of Mr. Barclay's evidence is not before the Court.  The fact that the Netherlands rely on Mr. Barclay's deposition testimony from another case indicates that Mr. Barclay was unavailable for deposition by these parties and would be unavailable to testify at trial.  Thus, the Court does not envision a circumstance in which a jury would have *more* evidence.

A separate order accompanies this memorandum opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge


Date: March 13, 2006.